NO. 8463

COURT OF APPEAL

PARISH OF ORLEANS

------

JULIA MATULEVITCH

versus

AMERICAN RAILWAY EXPRESS CO.

------

Bell dissents

Dinkelspiel; J.

The allegations of plaintiff's petition substantially allege: That on or about August 14th, 1918, the American Railway Express Company, undertook to deliver to petitioner at 116 West 72nd Street, New York City, a certain diamond pin, belonging to plaintiff, of the value of Two Thousand Dollars; and alleging further all charges having been paid, and notwithstanding amicable demand, said pin has never been delivered to plaintiff, either in New York, or elsewhere, but continues in the possession of the Express Company, which Company admits this fact. The prayer of the petition is that the Express Company be duly cited, and after due proceedings had, plaintiff have judgment either for the delivery of the pin or in default thereof, for the amount of Two Thousand Dollars.

To this petition the Express Company filed the following answer:. It substantially admits that it is a common carrier, and as such received a certain diamond pin, consigned by the Hart Jewelry Company to plaintiff at the address mentioned by her. Further averring that subsequent to delivery by the consignor, respondent was advised that the pin shipped had not been wholly paid for, and that the consignor had a vendor's lien and privilege on said pin, with the right of stoppage in transitu, and under instructions given by the consignor, respondent did not deliver the pin to plaintiff. The prayer of the answer is to be permitted to deposit the said pin in the registry of the Court and that the Hart Jewelry Company be cited to appear and make any claim it may have for the possession of said pin, and that respondent be dismissed, with costs, and for all general relief.

Subsequently the Public Administrator filed a motion in this case, to the effect that plaintiff claimed the ownership of a diamond pin valued at Two Thousand Dollars, which had been consigned to her by the Hart Jewelry Company, and that the Succession of the late Dino Valesi had been opened in the Civil Dis-

trict Court, and further showing that the pin forms part of the Succession of the deceased; that it was purchased by him, and that the claim made by plaintiff, for reasons assigned, was not valid. hence prayed that the pin in question be turned over to the Public Administrator until the further orders of Court.

Subsequently the Hart Jewelry Company filed its intervention, alleging that plaintiff has no interest as owner or otherwise, to the diamond pin in question, and alleging that said pin on June 1st, 1918 was sold to. Dino Valesi, for $1295.00 and there remains due and unpaid, the sum of $322.01, on which intervenor claims that it has a vendor's lien and privilege. Alleging further that on August 15th, 1918, Valesi instructed your intervenor to send the pin by express to the plaintiff, to whom he desired to give it, and giving the plaintiff's address, as heretofore stated. That subsequently intervenor delivered said pin to the American Railway Express Company for delivery to plaintiff, in New York. Valesi committed suicide in New Orleans, and intervenor exercised its right of stoppage in transitu, in order to protect its vendor's lien for the balance due on the pin. That under the laws of this State, the intention to donate said pin to plaintiff was never completed by manual delivery hence plaintiff is not entitled to the pin in question, but the estate of the deceased, under administration, after paying $322.01, being the amount for which it has a vendor's lien and privilege, was the owner of the pin.

The intervention and third opposition of the Public Administrator, alleging that the property in question is the property of the Succession of the deceased, Valesi, was filed; that plaintiff is not the owner, but that the heirs of the deceased are the owners of the pin in question and are entitled to it, and asked in their behalf for judgment in their favor.

On the trial of this case, plaintiff as a witness testified, that, being shown the diamond brooch and aked whether she

liked it or not, she replied that she was crazy about it, and that having with her a pearl and a diamond ring, she was asked: You can have it if you want it, provided you give me the diamond and the pearl that you have got.  Subsequently she testified that she gave this pearl and diamond to the deceased, Valesi, in exchange partly for the brooch in question; he was to have given her.this This occurred in the month of April, 1918; she testifies further that she gave the pin and the pearl to the deceased, and informed the Hart Jewelry Company that she would prefer to have a white stone set in the center of the brooch, for she did not like the yellow stone; and then:

Q. When was the next time you heard of it? A. Several weeks elapsed, and I think Mr. Valesi must have been in financial difficulties, because the pin wasn't presented to me, and the only reason why it wasn't must have been because he didn't have the money to pay for it, which I didn't know.

Q. Have you seen that pin since this substitution was made for the yellow stone? A. No, I only saw it in the store with they the yellow stone, but not since it was sent to me.

The other portions of her testimony, including cross interrogatories, by a careful examination shows material discrepancies in parts of her testimony, but we do not consider it necessary to quote any further at length from same. In connection with her testimony telegrams and letters going to and back between plaintiff and deceased were offered and filed in evidence.

In behalf of the Hart Jewelry Store, the testimony of Miss Denekamp shows that she had been connected with the Hart Jewelry Company prior to June, 1918, and when the sale was made th the deceased; she made the sale herself, plaintiff was in New York at the time.

Q. State exactly the transaction from its beginning? A. Mr. Valesi came in to look at the pin, and I showed him the mounting, and we figured how much it would cost to make up the pin; in the meantime

Mrs. Bickhart and Mr. Valesi had a falling out, so he asked me to hold the pin up; when he got to New York a month or so after, they had a fuss, and plaintiff wrote the witness a letter of inquiry, which is annexed to this record.

Q. What was the price of the brooch that Mr. Valesi first looked at? A. The first was $1155.00.

Q. Did he want any change made in the brooch? A. He always left anything to mx my judgment, he bxmughx bought everything from me, and I told him that the center stone didn't correspondent with the others, so he said if I could put a better stone in it, I believe it would come up to $1245.00 or $1395.00; after I had put the better stone in it, I allowed him $190.00 for the stone, and then he paid so much for the brooch.

Q. Was delivery of the stone made in New Orleans to Mr. Valesi or Miss Bickart? A. The stone or the brooch.

Q. The Brooch? A. Never, that letter will prove that.

Q. Do you recall her saying in your establishment, if Mr. Valesi would give her that brooch she would give him her engagement ring? A. I don't know anything about an engagement ring.

Q. Or any other piece of jewelry? A. No I didn't know she had any but what he gave her.

Q. Did you hear Valesi offer to give her this brooch provided she gave him her engagement ring? A. No.

Q. Or any other jewelry she had? A. No, my letter will show that too.

Rix Being shown the itemized account between the deceased and the Hart Jewelry Company she says it is correct, and the last check was for $322.00 and hx had died before the check was due it having been post dated.    The brooch was finally made up and expressed, and the same kind of stone Mr. Valesi ordered, and it was thus on the 13th of August.

On cross examination.

Q. When Mr. Valesi ordered that, did he tell you for what he was ordering it? A. Well, they xxxx both looked at the mounting together

110.

one day in the store; I happened to buy the mounting; and in
the meantime, like I told you, they had a falling out and he
decided not to give it to her.

Q. But didn't he originally intend to give it to her; wasn't
that the original purpose? A. Yes, sir.

She testified that the brooch was sent to New York,
consigned to Miss Bickart. Mr. Hart made the shipment.

Q. I don't know whether I understood you correctly or not;
I understood you to say that there was never any actual deliv-
ery of the brooch? A. Not physically.

Q. Either to her or to Mr. Valesi? A. No, sir.

The testimony of Samuel A. Hart states that he is the
President of the Hart Jewelry Company, and was so in 1918; that
he was Rxxxxdxxxxxx present at various times when the deceased
and Mrs. Bickart were in the store negotiating on different oc-
cassions. There was nothing said by either one about an exchange
of that brooch from him to her for an engagement ring or any oth-
er piece of jewelry that she had. There They were in the store a
number of times, he never heard any discussion that deceased
would give her the brooch if she would give him the ring; never
saw a ring. He testifies further the brooch was never delivered
to Valesi or Mrs. Bickart in New Orleans; he swears further that
Mrs. Bickart was not present at the time the selection was made,
and the objection in reference to the stone and its color was made
by the deceased.    The deceased gave a post dated check for $315.00,
the check being dated September 15th, and itwas it was agreed and
understood that when this check was paid the brooch belonged to
the deceased, but he died whilst the brooch was in transit.

We have detailed the pleadings, together with the testi-
mony of the parties connected with this case.

It appears proven that the deceased bought the brooch
in question from the Hart Jewelry Company, and had certain alter-
ations, a white stone put in the brooch, and a yellow stone removed,

111

at an extra cost. It appears further that whilst the plaintiff saw this brooch, her testimony to the effect that she *gave* any jewelry to the deceased in lieu or exchange in order to get possession of the brooch, is not confirmed, but on the contrary Mr. Hart and Miss Denekamp both testified that nothing of this kind ever occurred. The deceased bought this brooch and had the stone changed of his own accord, he paid a large amount during his lifetime, and gave a post dated check for the remainder, when he ordered that the brooch in question be sent to plaintiff. Dying in the meantime, the Jewelry Company stopped the ~~jamaixx~~ delivery of this brooch in transit and the question for our determination, is whether or not under the facts as herein recited, the brooch never reaching the possession of the donee, was a delivery as contemplated by the law, actually made to her.

The Civil Code, Art. 1539 provides: "The Manual Gift, that is the giving of ~~maxpxaai~~ corporeal movable ~~im~~ effects accompanied by a real delivery, is not subject to any formality."

It was held in the case of Succession of Sinnot, versus the Hibernia National Bank, 105 An. p. 705: "There can be, in Louisiana, no legal gift causa mortis of a movable, whether it be corporeal or any incorporeal movable."

"The agency of a person to deliver property to the donee thereof is revoked by the death of the donor.

Where the delivery of property to a third person, to be delivered to the donee thereof. is not enforcable as a gift because of the death of the donor before actual delivery to the donee. it cannot be enforced as a declaration in trust for the donee."

Trubey vs. Pease 68 N. E. 1005.

Alexander Brother Syndic of the Creditors of Peter Conrey vs. John Saul, et al. 11 An. 223.

Elkin's heirs vs. Elkin's executor. 11 La. 234.

It is contended on the other hand, that under Sec. 11, Article 94, of 1912, makes it the duty of the carrier to deliver the goods to the consignee. Reading the act in question: "A carrier, in the absence of some lawful excuse is bound to deliver goods upon a demand made either by the consginee named in the bill for the goods, or if the bill is negotiable by the holder thereof." And following various other causes for deliver, adds: "In case the carrier refused or fails to deliver the goods in compliance with the demand of the consignee. or holder, the burden shall be upon the carrier to establishethe existence of such refusal or failure."

And we find that in this case the fact that the carrier was notified that there was an impediment in his delivery of the article in question, first because of the death of the donor, and second because of the claims made xxxthxxxxxxxxx of the vendor's lien and privilege, we hold that under these circumstances the carrier was not bound to deliver the property in question, but on the contrary, acted wisely in doing what it has done.

We have examined the cases cited by counsel for appellant, O'Neill vs. Leinicke, 49 A. 3; Crawford vs. Puckett, 14 A. 649; Succession of Turgean, 130 La. 650; and waxfind in our opinion these authorities differentiate, and a careful reading will show that they in no wise conflict with the authorities we have cited in this case.

The judgment decreeing that there be judgment in favor of the Hart Jewelry Company and against the Succession of Dino Valesi, in the full sum of $322.01, with interest from June 1st, 1918, and recognizing its vendor's lien and privilege on the jewelry connected herein; and further decreeing that there be judgment in favor of the Public Administrator and the Consul of Italy, as representatives of Dino Valesi, and against Julia Biokart] decreeing said succession to be the owner of said jewelry;

subject to said vendor's lien and privilege; and further that the American Railway Express Company surrender said jewelry to the Public Administrator, as representative of the Succession of Dino Valesi, and be hence dismissed, with costs in its favor; is correct.

For the reasons assigned, it is ordered, adjudged and decreed, that the judgment of the Court a quo be and the same is hereby affirmed, costs of both Courts to be paid by the plaintiff, Mrs. Julia Bickart.

-Judgment affirmed-

*I respectfully dissent*

*O. H. Bell*
*Judge*